One Case for Argument, First Choice Womens Resource Centers v. Platt, No. 24-3124. And let's see. Mr. Wilson, whenever you are ready, please proceed. Good morning, Your Honor. Lincoln Wilson with Alliance Defending Freedom on behalf of Plaintiff's First Choice Womens Resource Centers, Inc. I'd like to reserve three minutes of my time for rebuttal. Great. May it please the Court, First Choice has experienced justiciable and irreparable harm from the Attorney General's subpoena for every day of the last year, and the District Attorney General's subpoena demands that First Choice produce the constitutionally protected identities of its donors and staff, which the U.S. Supreme Court has held is a classic chilling of First Amendment rights. Could we talk about the chilling effect? There are a couple of different routes that you press, and one of them is the chilling path taken by the Ninth Circuit in the Twitter case. Let's look at the declaration that was involved here, the donor declaration by Mr. Stratis. On the last page, he says we would have been less likely to donate if we had known information, but that sounds like it's talking about the past. What do we know about the future? It will chill our desire in the future to affiliate if our information is disclosed. But is that being chilled now, or is that imminent? Well, Your Honor, I think we have a couple of things. First, we can infer from that donor declaration a likelihood of future chill, both as to those anonymous donors and to other anonymous donors. But more important, Amy Huber, the director of First Choice, submitted a declaration of her own. It's at page 275 of the record, and I believe the relevant language is at 276 to 277. It details how the Attorney General's subpoena would chill future donors from contributing. All right, I'm looking at the impact on First Choice. Would it be likely to have a significant effect? Many donors desire to remain confidential, okay, general. But what makes this imminent enough? I believe it would be a betrayal of their confidences. I believe it's likely it would harm our current relationships. But, you know, we have to find that maybe it hasn't happened yet, but it's imminent. What is there here that shows that? I think it's exactly the same imminency that you had in Americans for Prosperity. In that case, it was the Attorney General corresponding with the organization and saying, I want your donor names, you're required to give me your donor names, and if you don't, I'm going to seek penalties against you, which include dissolution of your organization, sanctioning your board members. The Attorney General's subpoena demands the same type of information, demands the identities of donors, and it does it through a threat of sanctions. It's not, the Attorney General has said it's not self-executing. It actually is under New Jersey law, because New Jersey statutory law says that the Attorney General may apply for sanctions, including dissolution of the organization itself, if there's a failure to obey his subpoena. The Attorney General has not done that yet, right? In fact, your Honor, he did apply for sanctions when First Choice declined to produce this information, and though he moved specifically to impose sanctions on First Choice, and though the state court denied that motion, holding that it was premature, the Attorney General has not withdrawn his threat for sanctions if First Choice is held. Ultimately, he may, but don't we have to wait until there is a realistic threat rather than a potential threat? No, Your Honor, this is the same threat that Susan B. Anthony List versus Driehaus recognized as the sort of threat that would give rise even to pre-enforcement standing. The state court has said, why don't you guys sit down and decide what you consider producible and what you don't consider producible, and get this litigation narrowed down to exactly what the problem is, and neither side seems willing to do that. What's the problem with sitting down and discussing with your opponent what you will produce and what you consider you won't produce? You won't produce anything? No, Your Honor, we have produced documents under protest in response to the state court's order, but the problem is that it's a violation of our due process rights to be required to do that before we've received an adjudication. Okay, now, let's go back to chilling just a little bit. The last page of the Stratis Declaration says, we do not regard the Attorney General's purported designation as protecting against deception, but as an imminent threat to our protected associational rights. How should we read that? Should we read that as the imminency of the chill, that these are people who are scared now? I think that's true as to those donors in particular, and in NAACP versus Patterson, the Supreme Court recognized that organizations have standing to protect the rights of their donors. Okay, and I think it's Ms. Van Driessen was the state's lawyer in the state court, is that right? One of the state's attorneys. One of the state's attorneys wrote that, okay, we're willing to narrow it, but then at page 48 of the November 19 transcript says the state reserves its right to maybe come back and seek that information, but at this time, that's not the focus. Are those hedges enough to take this off the table? Should we say they're not chilled now because the state is setting this aside for the moment? Not at all, Your Honor. The state, for one, we've been litigating this issue for a year. There's been 46 briefs filed in this case over the course of last year in five different courts. We didn't hear about this narrowing of the demand until this court granted an expedited appeal, and that's what the first time the Attorney General mentioned it, and he's been very careful to say that he's not seeking those other donors at this time, and he's not seeing them currently, but even his narrow demand is still seeking the names of donors without any basis in the record to do so. He has required to show that he has a narrowly tailored basis to seek the names of these donors, and he doesn't have the first thing. Well, he hasn't. He said that he wants names of donors, of certain donors, not of all donors, who have contributed through advertisements or publications which he considers to be misleading, and he wants to question those donors as to whether they were misled as to the nature of the organization to which they were making their contribution. I mean, that's what I gather from reading the pleadings in this case, and is that an improper line of investigation for the state to follow when the state is saying that we are concerned that this organization is filing misleading information about the organization, both as to what it does and to what it supplies in the way of physicians and other medical personnel? Well, Your Honor, I think that theoretically that could be a legitimate interest. The problem is that the Attorney General hasn't shown that that interest is at play here. Okay, but that's all on the merits. That's if we reach the PI, and the District Court did not reach the PI, did not reach the merits, kicked the whole case on ripeness, saying the issue wasn't even ready for it to adjudicate, right? So you're asking us to go well beyond what the District Court even considered square on. Yes, Your Honor, we're asking, and because of the circumstances of this case, again, we've been briefing this issue for a year in a variety of different courts. We believe that our irreparable harm under Americans for Prosperity and NAACP versus Patterson is absolutely clear. It's the same type of harm. But there's a four-factor test for a PI, and the District Court is the one that ought to apply that in the first instance. We can't make these findings on the balance of the equities of the public interest or, you know, those kinds of things and how they weigh against the other factors in the first instance, can we? No, absolutely this court can. For one, as irreparable harm, First Choice has shown that as a matter of law, again, under Americans for Prosperity and NAACP versus Patterson, and the other issue is essentially the likelihood of success in the two of the four factors. There are two others. Yes, Your Honor, but the Attorney General hasn't shown any irreparable harm, and in a case involving the State Defendant, his harm collapses together with the public interest. So the fact that he has shown no... Now, that's interesting because we said something to the contrary this summer about how there are plenty of factors, and they shouldn't be collapsed into one another. My understanding, and I have to... The third and the fourth sometimes get merged, but they don't get collapsed into the first and the second ones. Well, Your Honor, I think the point is, is that the Attorney General has not shown any irreparable harm to himself or to the public interest if he's simply delayed in getting documents. The third factor is not about irreparable harm. It's about the balance of equities and the public, and then the fourth is public interest, and sometimes they'll get considered together, but irreparable is the second factor. Yes, Your Honor, but for the Attorney General to have about any harm that would outweigh first choice's irreparable harm, he would have to show something that was also irreparable. Instead, he's shown that he might be delayed in getting the names of some donors. That's not enough, but it's important to understand that this Court already tried to do this over the summer where there was a dispute about ripeness the first time around. This Court sent it back to the District Court saying it was undisputed that the matter was ripe, and the appeal was therefore moot, the appeal on jurisdiction, so the District Court should consider adjunctive relief in the first instance. Can I ask you a couple more questions about your chilling theories? I just want to make sure I fully understand the harms alleged. So you've been talking about the donors. You also allege some chilling with regard to your retaliation claim and the removal of information from a YouTube video. In the affidavit, it said, I think from Ms. Huber, that after learning it, meaning first choice was under Attorney General Plattken's investigation, first choice became concerned about the names of first choice staff, and that the videos could subject these individuals to harassment such as first choice was experiencing. So I just want to make sure I understand the harassment and scrutiny referenced in those two sentences is from the Attorney General, not from the public? Well, Your Honor, I think it would actually be from the public if the names come out, because the Attorney General has not offered a protective order that ensures that the information truly will be kept confidential. And even if he had... Sorry, before you go on to that, in the affidavit itself though, the affidavit states that the harassment and scrutiny, there's no information about public harassment in that affidavit. So I'm just trying to, as to what the sworn testimony of the Director is, the harassment seems to be related to the Attorney General's actions. Is that correct? I believe, Your Honor, there is a reference, it might be page 276 of the appendix, but Ms. Huber describes the intimidation and harassment that pro-life pregnancy centers have faced in the wake of the Dobbs decision. And that's sort of the background that goes to that. Certainly, we do believe there's also been harassment by the Attorney General. He's been very clear about his animus against pregnancy centers, and that's in the record with the consumer alert and with his open letter against pregnancy centers together with several other State Attorneys General. Now, if we're to draw... Sorry. Oh, I just wanted to ask a little bit more to clarify, turning to your chilling about the donors, and you just mentioned this, there was some concern about the names being leaked or publicly disclosed. To Judge Roth's point, it seemed like there was discussion about a protective order, and apparently that hasn't been reached. Is that... Can you address the availability of a protective order? What representations have been made about public disclosure? The parties were discussing a potential protective order in the State Court, but that was even as a matter of protest on First Choice's behalf. And may I briefly conclude, Your Honor? What Americans for Prosperity was clear about, though, was in that case, there was a question of whether the donors' names would be kept confidential if they were disclosed. And the U.S. Supreme Court- That was in a different posture, where they had actually had a hearing, and there was evidence that there was actually great access to these despite the promises that they were kept secret and confidential. So, if I could just ask you, is there a place on the record where we can look to what representations, if any, or what agreements, if any, have been made as to confidentiality? So, very briefly, with regard to Americans for Prosperity, the Court there, though there were questions about whether the information would be kept confidential, the U.S. Supreme Court made clear that- I've read the case. I'm just asking, I know Judge Bevis has another question. So, I'd just like to know if you can show me, or direct me to parts in the record regarding- I believe the Attorney General's proposed protective order is at page 507 of the record. That describes his proposal. We don't think that that provides adequate protection. At the same time, we also believe that under Americans for Prosperity, no protective order is an adequate remedy for our associational harm, and the Supreme involved leaks from information that's supposed to be kept. Regardless of the leaks, Your Honor, the U.S. Supreme Court didn't make that decision based on leaks. It said that there is a per se associational harm from the disclosure, even if it does not- even if there's assurances of confidentiality. Thank you. Mr. Feigenbaum, welcome back. Attorney General Platt can earn some frequent filer models. Thank you, Your Honor. It's always a fun trip to Philly from Jersey City. I'd like to start this morning by identifying quickly the two pathways we think we have to win on ripeness, which will take me first to Judge Bibas and Judge Chung's questions about chill, and then to Judge Roth's questions about prematurity generally. So, we do think that there's two independent ways in which we could prevail on the Article 3 ripeness question here, and this Court doesn't have to decide between those pathways in order to rule for us. I do think it has to decide between them in order to rule for the other side. You conceded ripeness the last time this case came up to this Court. That's exactly right, Your Honor. And this Court acted on the understanding. The parties had agreed to ripeness. We thought that, I mean, that's not necessarily a holding, but it's telling that you took an opposite position, we acted on it, and now you're changing your tune. I take the point. I don't think we're changing the tune about our view of the law. We're changing our tune about our understanding of the facts in the state court record. So, we're in concurrent litigation for about a year, and one of the features of concurrent litigation is that developments in either the federal court can affect state court, or state court can affect federal court. And so, at the time that we made that representation to this Court, we genuinely believed that the state court had issued an order compelling the production of documents. It turns out we were wrong. We thought that an order saying respond fully to the subpoena and granting our relief in full meant that we'd start getting documents, but First Choice responded with objections rather than with documents, and went back to the state court on the November 19th transcript and said, that was enough. When you said respond fully, you really just meant objections. She agreed, and then the December 2nd order, she said, that was right. So, there's no order compelling documents. It's not right. Okay. So, that's a response to the factual issue. You're right. There are two pathways being argued here about ripeness, and we don't even have to get to the merits. We can just decide ripeness one way or the other. The first one, as you say, is chill, and on chill, the leading case appears to be the, you know, the Twitter case from the Ninth Circuit, where Judge Nelson said that First Amendment issues nothing. That's in stark contrast to the cases that allege a generalized pre-enforcement challenge. I mean, you remember NSSF versus Attorney General of New Jersey, where you generalize, say, I'm afraid they'll be coming after me is not enough, or, you know, those kinds of cases. We have the Sherwin-Williams case, but First Amendment cases are different, and those weren't First Amendment cases. So, why isn't, why aren't the allegations, the declarations in the record enough to establish the chill? And if they're not, what would be enough? This is obviously a hugely important question in this case, so I think I have two legal responses and one factual response, if you'll indulge me. So, the first legal response is that Twitter itself explains that asserting a First Amendment harm and asserting chill is not enough. So, page 1176 of that opinion explains quite clearly that even if you're asserting a First Amendment chill, we do still have situations in which this is a non-self-executing subpoena. It remains entirely contingent on what the state court will do, and there's a lot of speculation baked in, with no harm from not producing documents in the first instance. So, Twitter acknowledges it's different, even in a First Amendment case, and found chill was not established in that case on those facts. Seattle Pacific University is exactly the same way, also from the Ninth Circuit, also relying on Twitter. It accepts that chill can create Article III injury, even for a non-self-executing subpoena, but still looks to the record to decide whether that's enough. Now, New Jersey law, I think this is really important, because I heard my friend on the other side say that these are self-executing subpoenas, and they are self-executing penalties, and that's going to up the chill. But that's just a misunderstanding of New Jersey law, and this Court's opinion in Smith & Wesson 1 explains how this works. So, I know there are two Smith & Wesson opinions. This can get a little confusing. This is the abstention one, which is 27F4886, and I'm talking about pages 893 and 894 of that opinion. And on those pages, what this Court already explained, and rejecting our arguments about abstention in that case, is that although there are penalties in our statute for non-response, the penalties are, quote, not self-executing. A court will impose them only after a subpoenaed party violates a court order, and then continues to say New Jersey courts still have to adjudicate their Smith & Wesson's constitutional arguments, and even if the arguments are resolved against the recipient, the state courts still have to give them an opportunity to produce the documents before contempt. So, there's no immediate action that has to be taken in which they have to conform. Okay, but a couple of points that come out of this. First of all, you're not now making an abstention or younger argument. No, no, not at all, Your Honor. And you are not making res judicata arguments, correct? That's correct. We are not making that argument. And in terms of immediacy, cases like Sherwin-Williams and Esfeth say it's not just a current harm. If it's an imminent future harm, that suffices, right? Now, the argument there seems to be, well, there's a bunch of other steps that have to be gone through. So, you have to come relatively close, but the other side says, if you fall over the line, you wind up in a preclusion trap. And at some point, it's too late once there's res judicata in the state court. I see you're nodding. You're agreeing with that. Yes and no. I'm nodding that I know where the scholicly is going, and I'm happy to sort of join issues with the question. You have a right to sue in federal court. We know that from Moreau versus Pate. We know Nick versus Township versus Scott. There's no exhaustion requirement under 1983. And Nick said these takings claims in state court are right, because if we waited any later, you would then get a state court ruling that would preclude you from getting your shot at federal litigation. So, how much later are they supposed to wait without getting in the preclusion trap that Nick said you don't have to get into? So, let me start with NSSF, and let me turn to the Nick preclusion argument, because they're both in there, and I think it's really important. So, there's a key difference between Sherwin-Williams and NSSF and other forms of statutory enforcement, and then the enforcement of a non-self-executing subpoena. And it's when you might have to conform your conduct, because chill is about the risk you might have to conform your conduct. You conform your conduct, or in this case, donors conform their conduct. You admit that that could be a cognizable chill for ripeness purposes. If we're going the Twitter way instead of the Google way, then yes. If we're going the Twitter way rather than the general level of ripeness for statutes, that could be enough. And it doesn't have to be that I stopped giving, or I'm definitely not giving. The chill can be enough such that I am deterred or likely to be deterred from giving, as long as it's imminent enough. So, I think it's worth talking about the declaration, then I'll come back to the NSSF and points, because it's obviously driving a fair bit of the colloquies. So, if this court turns to pages JA-285 and 286, we'll see some important information about the declarations in this case. Judge Bibas already highlighted some of the shortcomings on what are precisely alleged, but there's a really important shortcoming that hasn't come up yet today. So, if you go to subsection I of the declaration, it collects the ways that donors have contributed, and these are the donors they're talking about. And so, it's subpart I, Romanet I, Romanet II, Romanet III through V. None of those are the two client websites. None of the donors they're talking about are to the websites we actually care about. But that's assuming New Jersey has permanently curtailed the threat of the subpoena, which it hasn't done, is that right? Yes and no. It's not quite right, and I know there's some confusion on this point. So, we make a representation at the November 19th hearing, and we make the representation again, that what we're looking for is the donors who gave to these two websites. Now, we've since submitted a letter to the other side, happy to submit it via 28J, that tries to reopen the meet and confer process to Judge Roth's questions. We're willing to engage the state courts, beg us to engage in the meet and confer process, and we're happy to do it. And what we explain there, and what we were trying to explain in the November 19th transcript is, what we want right now is two things as it relates to donor names. One, we want the donor names only for those two websites. And again, those aren't these donors. I believe one of the two websites doesn't even have a donate button on it. The other one, you have to go through a pull-down menu in order to get to a donate link. That's right. It's possible the donor list is really small to that website, and they can tell us that, but they've never given us the number. If it's hundreds, that'll raise some questions. If it's one or two, your point might be right, that it's hard to get to that donor page. But that's where we have concerns, and we don't have the factual information to know the denominator. But going more broadly to Judge Chung's question on this point, what we say is we want, one, the names for those websites, who donate through those websites. And two, we need to know more about your other solicitations. They came and told us there's church galas, there's other sorts of big fundraising events. We realized we didn't know that when we cut the subpoena. We realized those are not the ones where you're likely not to know the mission of first choice. And so they want to emphasize all the information we now have we didn't have then, but have you not look at how we responded to that information by dropping some of those broader requests. And so what we said in the meet and confer letter, I'm so sorry, Your Honor, just to finish this thought, what we said in the meet and confer letter is we want to also know more about those other solicitations, not the names, the other forms of solicitation. And if one of them looks like it might be similarly misleading, we'll cut a separate subpoena to ask for that information. It's not contained in this subpoena anymore. Again, happy to submit it by a 28-J, but all this is before an order compelling documents. There will never be a state court order compelling documents on this subpoena for names other than from those websites. Except the subpoena itself is much broader than that. And you've gotten all the way into court, all the way it's past the subpoena threatened, past subpoena issued, you've sued in court, the court enforcing other parts of the subpoena. If that was enough to ripen, voluntary cessation and backing off can't moot it. It's an incredibly heavy burden to show voluntary cessation. So that doesn't get you out from under it, especially since in the state court and here you're saying, well, we could come back and ask for those things. So the question is, if it ripened earlier, that's enough for ripeness, right? We're setting aside the merits. There's no good reason for us to reach the merits of the PI, but if it's ripe and you said it was ripe earlier and then some things changed to things, why isn't that enough? So I actually think this highlights what an advisory opinion enterprise this whole case is right now and what they're asking you to do. What they've asked you to do is say, we cut a subpoena that from the very first said, we're not interested in names that gave to the main donor website. And they said, oh, you're not thinking of all this information like churches, galas, et cetera. And so we come back and say, before there's ever been an order compelling any documents, and this is important, it hasn't enforced other parts of the subpoena. Nothing is enforced. Nothing has been compelled. Objections have been fine to any response in the subpoena to date. So there is no order compelling documents to aggravate frustration in this case. And before there's ever been an order, we've dropped any request for names that would be in information they gave us. So I think this shows that if you did issue an opinion saying, well, if the state court compelled documents that covered that, that would be a problem. We have to wait until the court enforces the challenged parts of the subpoena. So this gets back to NSSF. Then there's the preclusion trap. And in those other cases, NSSF and others were saying, it's not right when someone blasts into court preemptively and says, we're afraid of being multiple steps past that. So in terms of, well, let me just do Nick, and then I'll go to the steps past that, because I know we want to talk about Nick. So I think the problem with the preclusion argument is threefold. I think it proves too much. I think it misunderstands Nick. And I think it won't always necessarily be true. We actually thought at one point it might not be true in this very case. So first, I think the argument proves too much. If preclusion alone is enough to allow a subpoena recipient into the court it wants to be in, then Reisman and this court's decision in Weerly are necessarily wrong. Weerly was a case in which the subpoena recipient wanted to be in DNJ, but the agency was going to move to enforce in DDC. At the end of a DDC enforcement action, you'll have preclusion in DNJ. It's the exact same problem. You have a preferred fora, you have an enforcement fora, and you're going to end up with preclusion. The only difference is this is state court. But this is where Google really kicks in, and this is where Taflin really kicks in. We don't assume that the state court can't be trusted to handle these constitutional claims, just like DNJ doesn't assume DDC can't be trusted. No, there's a difference. Reisman and Weerly are both federal agencies, right? But Nick and Monroe say you've got a right to a federal forum for the federal claim. Those are distinguishable because there's prudential rightness issues. Why doesn't the, if the federal court's going to get it anyway, why not get it later rather than sooner? Federalism versus federal forum is an issue here and not in those precedents. So I take the point, I do think Google has a response, which is treating the state forum as sort of worse for this, is not how we do federalism. But going straight, that segues perfectly into the second answer, which is that's not exactly what Nick is saying. The basic submission we have is Section 93 creates a federal forum when Article 3 creates federal jurisdiction. This doesn't come up in Nick because there's clearly federal jurisdiction in Nick over the takings claim. There's a judicially imposed exhaustion requirement on top of the exercise of that jurisdiction that ultimately falls away. So it's true that in Nick, you can't allow these judicially imposed requirements to create a preclusion trap. But what you can always do is not decide cases when Article 3 tells you not to decide those cases. And I worry a bit that this case is really looking to bend Article 3 because we're nervous about state court adjudication that Taflin says not to be nervous about at all. Let's go to the facts of the donor declaration by the lawyer, Stratis, who relays this affidavit for anonymous donors. And I'm looking at the last page. And under Q, we do not regard the purported investigation as protecting against possible deception, but as an imminent threat to our protected associational rights. And they talk about the chill of associating with, in the paragraph before, chilling, affiliating with, and supporting, fairly read as donating, pro-life organizations, even privately, due to the risk those protected relationships will be disclosed to openly hostile law enforcement officers. If that's not enough, what is enough to show complete chill? I'm going to run over time. Yes, because you still have my question to answer. I do, I do. I promise to turn to them, Judge Roth, I swear. So really quickly, it has two problems with the declaration. The first is, and I mentioned this earlier, and I realize this gets in my copies with Judge Chung on narrowing of the subpoena, but we're not talking about donors whose names are going to be disclosed here. And so none of these donors' names are going to be disclosed. And all along, from the very first day of the subpoena, you could have known you could donate to their quote-unquote donor website without ever having these concerns. So it's not even the case, it's not like AFB at all, where we want every donor. It's not even a targeted set of donors who can never get out of it. If you want to donate to First Choice, and you know what First Choice does, donate on the webpage that says what First Choice does and isn't at all potentially misleading about its mission and operation. So the chill argument doesn't really make sense when we're only looking for particular websites or even from the very beginning of the subpoena, when there was a clear way to donate when your names would never have been disclosed. So that's problem one. Problem two is I think this is a fairly conclusory allegation. What they're saying is we disagree on the merits with the Attorney General's claims and his motive for the subpoena. And so because we disagree with him on the merits of what's motivating this, and obviously we disagree with that position on the merits, we're chilled as a result. But that's sort of taking their view of the merits and turning it into First Amendment chill. Now, I'm sorry, Ketchum. So that argument basically makes the timing meaningless because even if donors were currently withholding donations under your analysis, that would still not be enough. Because it's merits rather than constitutional, cognizable chill. Yeah, I take the point. I think it might arguably different if you have a donor actually covered by the subpoena who is not themselves now willing to make any donations. I'm sort of making an all of the above argument. They're not the covered donors. There's always been a way to donate on the face of the subpoena where your name wouldn't be disclosed. And they're blending it with merits and taken together. I think that underlines the chill. The public goes and reads very carefully what the scope of the subpoena is and isn't. And I'm not sure that people know so finely. But I'm sorry, I've been delaying Judge Roth's. You've been very carefully answering our questions, but I know you wanted to get to Judge Roth's questions. Judge Roth, if you'll forgive me, there's one last piece to my answer to Judge Beavis I want to make sure to give. Judge Beavis, the last thing I wanted to say that makes this case different from Nick on the preclusion question is that there are two ways that preclusion doesn't necessarily attach. One is applicable to New Jersey and one is sort of global but wouldn't be applicable to New Jersey. So I just want to be candid about that up front. The first is there is a world in which a state court enforces, meaning orders the production of documents, enforces the subpoena and expressly refuses to reach constitutional claims. There was an argument that that's what had happened in this case. We now know it isn't what happened in this case. But we dropped the rightness argument when we thought the court had compelled production. And then the court said, and I didn't reach those constitutional claims that we thought she possibly had. And judgeship recognizes, unlike in Nick, that is a situation where preclusion wouldn't attach right here in New Jersey. So that's thing one, which is different from Nick in Williamson County. Item two is, unlike in Nick in Williamson County, we're in 100% of the states all the time. You would never have preclusion or you would always have preclusion because of the way exhaustion works. This is going to turn on sort of the vagaries of state preclusion law as it relates to subpoena enforcement actions state by state. Now it is true, and this is established in Smith and Wesson too, that there is going to be preclusion at the end of a subpoena enforcement action in New Jersey. So I'm not disagreeing there. I'm just noting this is a little different than you see in the Nick context because it's a little more state by state state preclusion law. And the other side, I think kind of has an interesting argument. They tell the state court at every opportunity she cannot make them turn over any documents until she adjudicates their selective enforcement and viewpoint claims and their associational claims. They say that over and over. But they tell this court they'll then be preclusion. And there's a little bit of have your cake and eat it too that they wanted adjudicated in the state court for the state court to move forward. But the fact that there'll be preclusion at the end means this court needs to absolutely operate, maybe bending the lines of Article III. So I just don't think those things cohere. But to Judge Roth's questions that we've all promised to get to today, I do think that there's a real question about prematurity in exactly the way that your questions were identifying. So this is an important distinction from what Judge Bevis was saying earlier about NSSF and Sherwin-Williams. Those are cases about statutory enforcement where there's an obviously stronger pressure or chill because you actually have to do something potentially before the court order, right? So take a criminal case. There's a statute that says you may not do X. Now, if the prosecutor goes forward and the jury finds you didn't do X or X isn't actually unlawful, the judge says, you'll be okay. But if the state wins, you're gonna be punished for what you did before that court order. That's where chill comes in. That's why you normally don't have to wait for a court order. As you pointed out in your questions, Judge Roth, non-self-executing subpoenas are entirely different. This is the thrust of Google and this is the thrust of Twitter. Non-self-executing subpoenas, you don't have to conform your conduct before the court order because as Smith and Wesson explains, once there's a court order, then there's gonna be a separate stage in which you can seek enforcement of the order backed by contempt. And if I can give three citations from this very case that prove the point, I would give Supplemental Appendix 484, which is our original prayer for relief in this case, the first time we went into state court, where all we asked for was the production of documents. Then at JA- Sorry, page number? I'm sorry, Supplemental Appendix 484. Then on JA Joint Appendix 464, we have our motion to enforce litigants' rights. That's when we thought there was a court order compelling document. That's how we'd read the court's order. And then we said, they didn't give us documents in response to the court order compelling documents. Now, please give us sanctions, give us monetary sanctions, give us attorney's fees. And then you have JA-659, which is the trial court explaining, no, I never made them turn over documents, so they haven't violated my order. So sanctions are coming off the table. And when you put those three things together, that's how the non-self-executing subpoena system works. First, we go seek documents. Either we get the order or we don't get the order. It's one of the contingencies in this case. But even if we do get the order, and we haven't yet, even if we do get the order, they then still have time to comply. The case would certainly be ripe then. There's a potential risk for preclusion, depending on what she adjudicates at their request. But it would be ripe at that point. And then they could conform their conduct. And then I would understand better their arguments about chill. So your position is it would be ripe once the court orders turning over the disputed documents. But at that point, you concede they could well be precluded at that point from challenging, and then the federal court would just have to, full faith and credit, have to go along with what the state court had done. Yeah, I basically agree with one tweak. If you'll indulge me, which is, I think that's the correct way to resolve this case. That is New Jersey's frontline position. New Jersey is fine with an opinion from this court saying, this is not the case where we have to decide Google versus Twitter. I think the delta is pretty small between the two, because Twitter at 1176 agrees with a lot of the points Google is making about non-self-executing subpoenas. But you can say, we'll leave open that there might be this delta for First Amendment chill cases. But on this particular record, given the flaws in the declaration this court already identified, and the additional ones I'm pointing out about where these donors actually donated, and how these particular requests work, and the narrowing we did before there was ever an order compelling documents, in this particular case, we ultimately don't have the kind of chill-based practice. You're narrowing dates to November 19th, right? Not quite. There's a bit of a debate about the state court record here. So if you look at JA-475, this is a comment we made in the July hearing where we explain request 26 as being about the donors to those two websites. Now, we don't go on and say we're foreclosing everything else. State court hearings, not everything is as clear as we would like in every transcript. This has always been the thrust of what we've been looking for. And as they give us more information about what else is out there, we narrow. We didn't know about the church galas when we first got the subpoena. If I were on their side, this would feel like a moving target, which again, it might bear on the merits of what the state court should rule. But in terms of ripeness, just like it feels right, but isn't right. How broad is the subpoena? How not? It just seems odd not to take the subpoena at face value here where you haven't unequivocally taken these things off the table. And as recently as November 19th, you're saying, hey, we could come back and seek these other things. Again, I think it is unequivocal. I can submit a 28-J, but to your point about the moving target. But my question still is, the state court has said, I want you guys to sit down and decide what can be produced and what can't be produced. And why haven't you done that? We are doing that. There's a big debate between the parties. I don't want to get too much into a they said, they said. But there's a big dispute between the parties on who's at fault for the meet and confer process breakdown. We are ready and willing to engage in a meet and confer. They're not willing. As a judge, I don't care who's at fault. I think as a district judge, when I have told parties, sit down and resolve this. And if you don't, I'll resolve it for you. But if the parties can resolve a dispute like this, it saves the court time. It saves the parties time. And if you look at efficiency and a good outcome of any litigation, I think it's the way to go. And the district court here has said, do that. And I am concerned that it hasn't been done. We totally understand. We are happy to do it. We wrote to them to reinitiate the proceedings. It is not like they blew us off. We haven't given them a lot of time to respond yet. They will respond this week. Totally normal. This is a fast-moving case. We just got the order on December 2nd. So I don't mean to accuse them of blowing off the process. We hear you loud and clear. We heard Judge Adubato, the state court judge, loud and clear. We're happy to engage in that process. My basic submission is that's one of the things that makes this case so hopelessly speculative, that makes this case such an advisory opinion. She's asking us to go through a meet and confer process, the sort of thing you don't see in an MSSF, you don't see in a Sherwin-Williams, because she has total discretion on whether to compel documents and then, if you then don't comply, to issue contempt, to issue some sort of sanctions. None of that has happened here. All of this narrowing happened, including pursuant to her request for a meet and confer. So it's not, this case is a moving target. It's frustrated us, obviously, in the state court, that we haven't understood at all times what the state court order meant. And so the parties had a hard time engaging in a meet and confer, candidly, when we thought the court order said compel documents and they thought the court order said compel only objections. They ended up being right. That will affect the meet and confer, I realize, going forward. But the parties were pretty far apart because it was a moving target on what the state court had argued. But the fact we have a moving target on what the state court had argued, had decided, and as these orders have evolved the whole time, really, I think, does undergird how speculative this all is. So it's not that we're a moving target. Our positions to this court have evolved in light of the factual changes in the state court record. Our involvement in the meet and confer has been impacted by the decisions the state court is making. And the narrowing that we've been talking about at the podium today are precisely the sorts of things you'd expect us to do in a meet and confer, in a situation where the state court, all before she's ever compelled, mandatory production of a single document. So it just seems like we're really jumping the line going to federal court and making this Article III. And I think we're really jumping the line to say this is an imminent, irreparable harm. Because Judge Bibas, to go back to one thing you said in a colloquy with my friends on the other side, I realized that the district judge did not reach the merits. We fully briefed the merits. We've presented the merits. We're happy to argue about the merits. But he did make points about irreparable harm. So I do think it would be fair for this court. I think this court could reach the merits, but it's definitely fair for this court to reach irreparable harm standing where we are and saying, you know, I think this isn't enough for chill-based Article III ripeness, but for the really high bar of imminent irreparable harm, I think it certainly doesn't clear that. I do have one question about irreparable harm. So for instance, for the selective enforcement viewpoint discrimination claim, you argue that Planned Parenthood is not similarly situated and give reasons for that. And that could be a good basis to dismiss a claim or to deny a PI. But is there a lesser showing needed for ripeness? Isn't that issue something to be decided because the case is ripe and then you can discover, address the motion to dismiss and PI? Or is the question before us for ripeness the same sort of imminence? So I just want to disaggregate two things that are baked into your question. I do think the point about Planned Parenthood as a comparator is a merits point. So whether or not Planned Parenthood is a good comparator is not a ripeness point, does not go to the imminence of the irreparable harm. I think it's an important merits point. I really do think there are significant flaws in both of their merits arguments presented to this court. But I'm not saying that their failures on their comparator points are the reasons they don't have imminent harm. I think the reasons they don't have imminent irreparable harm are because the state court has not compelled production of documents. The state court took sanctions off the table. The mere possibility of a preclusive state court decision is not itself a First Amendment injury because they will have those claims adjudicated if that happens. And because the actual evidence they've put in front of you. So we talked about the donor declaration. I'm happy to talk about the Huber declaration too. The actual evidence that they put in front of you in this case doesn't establish sufficiently imminent harms. So we talk about their self-takedown of videos. This is something I know that Judge Shipp talked about. I think there's a couple problems with that argument. But the most important problem with that argument is it's not even something that the subpoena has ever really been focused on. So they haven't taken down anything about the donor webpage on the client website, which has obviously been the locus all along. They haven't taken down their representations about being a network of clinics. They haven't taken down their representations about coming there so that you can learn more about the abortion pill and learn more about abortion procedures. If they had, would that have made their chilling cognizable at this point? I think possibly. I think it would be stronger. You always have to ask if this is what the objectively reasonable recipient of the subpoena would do in a particular case. But I think the fact that they've shown a sufficient firmness that none of the relevant representations have been taken down is certainly indicative of what an objectively reasonable entity would do. What they took down were videos that identify their staff for fear of harassment. But this gets to a question you asked some time ago this morning, which is the harassment was public harassment. That's very clear from the Huber Declaration when she's talking about the kind of harassment that they needed to worry about. Because it's saying that after DOBS, they're getting harassment, they're getting concerns about violence, et cetera. Those were not the sorts of things that they were saying were coming from the Attorney General. They say, since the publication of the leaked draft in DOBS, pro-life organizations, especially pregnancy resource centers like First Choice, they're not even giving evidence about First Choice itself, have been subjected to an increased level of criminal acts, intimidation, and harassment. Based on this pattern of violence and intimidation, they're concerned that if donors' identities become public, they may be subject to similar threats. So it safeguards donors' identities. But we've agreed to confidentiality requirements at every step of the way. And they say it's not good enough because they don't want the Attorney General to know. But the Attorney General is not subjecting anyone to violence and threats in that way. I thought, though, in Bonta, that was exactly the problem, that this information was supposed to be confidential and then it leaked. And that's precisely why the Supreme Court recognized the First Amendment problem. So I think two points to that one. There's nothing in this record suggesting that New Jersey has been unable to hold on to its information. I think the fact that California had a leak on different information years ago means New Jersey can't be trusted with its confidentiality, would have reams of problems that go beyond this specific case. And I just don't think that's how we normally think of states when they don't have their own. NAACP versus Button. I mean, you know, the multiple anonymity cases where the court is really concerned, oh, we just want this information for a little purpose. But Button recognized real, you know, it's a First Amendment problem because of the fear, even if the fear doesn't eventuate in a particular case. So two things on that. One, I do think the fear the reactions and the fears need to be objectively reasonable for Chell. I think Twitter talks about that. I think it makes good sense that we're not talking about. I don't mean to use Eggshell Point to fit an insulting way to anyone, but the concept of the idea. And I just don't think a targeted subpoena so different from what we saw in AFB, so different from what we saw in NAACP, but a targeted subpoena, well-grounded in the reasons for it, asking for a subset of names. We really don't know if we're talking about 10 or if we're talking about 1,000 based on these particular websites. You've given reasons, Judge Bubas, to think it might be a low number. That would also go to how well we can keep this information guarded and how much Chell we would really expect in this particular case when those donors aren't covered. But that's information we don't have in this record today. And it really is their burden to establish an Article III injury that's sufficiently ripe, that isn't contingent, where the harm is real in the here and now. And that doesn't rely on these sort of future speculative steps that we're still waiting for. If we send it back without deciding on the PI, are there arguments you're going to make about balance of equities and public interest and the like that might sway the district court? I hope they'll sway the district court. We've included some of them in our briefing before this court. We have briefed all four factors to this court. We wanted to make sure you had the full presentation of our briefing here. And I do think, to be clear, and this court has said many times over, you need an irreparable harm to justify a preliminary injunction. So if you agree with us, there isn't irreparable harm here. That would also end the PI. I realize it doesn't end the case. To find that there's a ripe claim but no irreparable harm ends the PI, but the case will continue moving forward. We'll brief the merits, et cetera. But I'm not sure that's quite right given my concerns on this. But if we do send it back, I mean, you kind of objected to first choices expediting before this court. Would you agree if we were not to resolve the PI issue, in return, you would agree to expedited briefing in the district court on that? Yeah, I don't mean to like negotiate with the panel right up here. We need a reasonable schedule. This is a challenging schedule. As this court is aware, and I will just say for what it's worth, I think our points earlier in the motion stage, dangerous to say this to the motions judge, but I think some of our points about how there wasn't actually an imminent requirement to produce documents at any point ended up being borne out. The judge actually sided with them and on December 2nd said, no motion to enforce. You don't have to produce documents. Engage in a meet and confer. Some of it's going to depend as well on are they willing to move forward in the meet and confer? Do we need to go back to state court? When does that get adjudicated? It's hard to have concurrent litigation and to try to make the two pieces work together. And I realize each one has collateral consequences for the other. So I don't oppose a PI moving on a usual expeditious PI schedule, but I would note, it's going to depend a bit on what happens in the meet and confer and what's happening in state court for what kind of harms they can justify. This court can also tell the district court whatever it wants to tell it about what it would have to do on remand. Although I would just submit, I don't think there should be a remand given the failures on article three. Anything else? Anything? Nothing further. Thank you, Mr. General Feigenbaum.  All right. Mr. Wilson, I think you reserved three minutes for public comment. Maybe he could start out with my question about meeting and conferring. Have you done that? Are you willing to do that? If not, why not? Yes, Your Honor. We have met and conferred with the Attorney General. We're willing to do it. The problem is that in the state court proceedings, we were forced to do that with our backs against the wall, against an order that we've had no opportunity to challenge the constitutionality of the subpoena as a whole. The district, the state court, and this- Well, that's why you're meeting and conferring as to where you really need to direct your constitutional argument. Well, Your Honor, I think that we are entitled, when we have challenged the constitutionality of that subpoena in its entirety, we're entitled to an adjudicate- I think it's ridiculous to challenge it in its entirety. I thought you had focused on a few numbered subparts, including, what, 26? Was it the websites? Our association claims relate to those specific requests, but our retaliation claims, Your Honor, do go to the entire subpoena because we believe that we've shown the elements of retaliation that the entire subpoena is grounded in animus by the Attorney General against pregnancy centers. Well, let's talk about the association claims. Which parts of the subpoena are the ones that are relevant to that? The first one would be the donor demand. I believe it's request number 26. And I don't have up with me the references to the other demands that they would relate to the identities of staff, medical staff, and then they would also relate to the communications with other pro-life organizations that the Attorney General has demanded. OK, so four was the videos, and then 14 was the professional licensees who work for you, and 26 was the identities of the donors through anywhere else on the donor solicitation page. That sounds right. There's one more request about communications with Heartbeat and Care Net, which are other pro-life organizations that First Choice has relationships with and the Attorney General is looking for. OK. And I should have mentioned up front, given the Solicitor General was given some latitude with his time and allowed to go over, if the court could provide me some similar indulgence to cover some of the points that he made, I would very much appreciate it. Briefly. So I think that the clearest thing that resolves this case, the court doesn't need to go further, is the fact that we have actual enforcement here. You know, we can address all those pre-enforcement questions and we think that we are right under Americans for Prosperity, but we have actual enforcement. The Attorney General went to state court. He moved to enforce his subpoena. As he said, the relief he requested in that action was to compel production of documents and the trial court was unmistakably clear that it granted that request in full. The issue was that the relief was to respond fully to the subpoena. Now, First Choice is doing that and First Choice has been responding to the subpoena under protest. It has produced documents in compliance with that. First Choice faces a present harm because of that ongoing being subjected to that unconstitutional subpoena without being given an opportunity to challenge it. It had a federal guaranteed right under Nick versus... The response part of the challenge that the judge is asking you if you're not going to compel, if you're not going to produce it, then you should say why you're not and what your challenge is. Yes, Your Honor, and that's what the order contemplates, but it did require production of documents because anything that was undisputed is within the proper scope we were required to produce. We produced under protest, but without having any opportunity for an adjudication of our viewpoint discrimination or our retaliation claims that go to the subpoena as a whole. Now, we think that that fact of enforcement that is current, it's present, and we are now forced to negotiate against the background of that order without an adjudication of our rights totally illustrates why we have irreparable harm that needs to be adjudicated now. And though the court might be disinclined to grant injunctive relief in this posture, we think it's important that we get some kind of assurance. Judge Bibas, you mentioned the possibility of remanding with expedited briefing in the district court. Well, the fact is we had expedited briefing the last time this court remanded with an instruction to consider injunctive relief, and we never got a ruling on our temporary restraining order motion, and we didn't get an order on our preliminary injunction motion for almost four months after sanctions proceedings were filed against us in state court and the Attorney General sought to remand our appeal in the appellate division in state court. Now, there's every indication that the same thing is going to happen here if we have to remand again, because the Attorney General in his letter yesterday, he's emphasizing that he is withdrawing some demands, though, again, without making any commitments to really get rid of them. Well, why don't you sit down and discuss it with him then? Yes, Your Honor, the Attorney General sent a letter yesterday where he has emphasized that he is at this time not seeking certain of the donors, but he's also said that he's going to move to dismiss our appeal in state court. So that means that that makes it much more imminent again that we don't get to go through the appellate process in state court instead we're back in the trial court working through those issues again. And this is, you know, the Attorney General has characterized it as the case has been a moving target. I submit his positions have been a moving target. Why don't you sit down and discuss it with him then? Your Honor, we have done so, and the Attorney General mentioned that it's a who's to say who's really at fault in this situation. But I think the state court's order on the last motion shows the problems in the Attorney General's conferral and lack of conferral in this case. And I'd refer to the court to that order for a record of his actions. He's saying he won't confer, but he is saying he is conferring. The first invitation to reconfer that we got was his letter yesterday after he was rebuked for having not conferred in the December 2nd order of the state trial court. But the fact is, is that what we've seen is every time the case gets to federal court, the Attorney General offers some reason to not decide it now. He told this court last summer, don't decide the motion for injunction pending appeal, just remand it to the district court. And as soon as it was back down in the district court, he was full speed ahead in state court proceedings seeking sanctions against us and we couldn't get the district court to decide the case. So if this court is not going to decide those merits issues, and we agree with the Attorney General's concession, those issues are properly before this court and this court can do so, it must at least give us some sort of assurance and guidance to the district court to enter a temporary restraining order or some sort of protection for the ongoing shifting of positions that we've had to deal with over the last year. And we do think that the court has the mechanism in front of it to fully consider the merits and resolve these issues. There's a motion for injunction pending appeal that is also submitted to this court simultaneous with this. I don't think this is responsive to what Mr. Feigenbaum was arguing and we gave you flexibility on the time just to make sure you could respond to the specific points he made. Your Honor, if that's the court's determination, I do have a couple other points I'd like to address, but if the court would... Only if they're directly responsive to what Mr. Feigenbaum said. I'll briefly say that the Attorney General's theory is one that we can litigate our federal claims in state court, but we can't litigate our federal claims in federal court. If his theory was correct, AFP versus Bonta was not right. AFP versus Bonta would not have been ready for decision because he had the same type of record of demands by the Attorney General for donor information. There was enough of a threat of sanctions of board members and of the organization that there was a ripe controversy created. According to him, until those penalties were actually imposed, AFP shouldn't have been able to go to court. Now, obviously, the Supreme Court didn't address ripeness, but I think it would be pretty remarkable to conclude that the issue was not right in that case. One final note with regard to self-executing penalties and self-enforcing subpoenas. The Attorney General points to this court's decision in Smith and Wesson, but he omits the actual statutory language here, which is NJSA 56 colon 8-6. And that statute says that failure to obey any subpoena entitles the Attorney General to move for sanctions in the state court. That's what he did based on his belief that we had failed to obey a subpoena. That means that it is self-executing, unlike the Twitter subpoena, unlike the Google subpoena, where there's no prospect of penalties until there's been an order of contempt under the Texas and Mississippi regimes in those case. Here, New Jersey's regime specifically makes penalties and sanctions available for failure to obey a subpoena, not just for failure to obey an order enforcing law. But the state court has said that that, that the case has not yet reached that point, even though at one point the Attorney General thought it had, the state court has clarified that the litigation in the state court has not yet reached that point. And we very much appreciate the state court's indulgence. But the fact is, the Attorney General hasn't withdrawn any of his demands. The Attorney General hasn't withdrawn any of his claims that he's entitled to these penalties. And he'll bring them again. And when the state court adopts them and accepts them, then the case is right. We believe that it's not whether the state court adopts them, it's his threat that ribbons the case. 1983 is to address actions by state officials under color of state law. The Attorney General is a state official. He's threatened action against us under state law, demanding constitutionally protected information, doing so in discrimination against our viewpoint in ways that establish a retaliation claim. We have present First Amendment chilling of our association and of our speech that threatens our donor relationships and threatens our staff in ways that we think are clearly established that this case is right. And given the constant shifting over the last year, we believe that the court should take some sort of action to ensure that we have appropriate injunctive relief if this case returns to the district court. Is there a note for the questions? Thank you, Counselor. Thank you, Your Honor. We thank both parties for their briefing and very helpful oral argument. We'll take them either on advisement or recess. But before that, we'd like to greet both arguing counsel over at the side.